127  287
37a  532
37a  620
127  287
64a  244

## LEVI Z. LEITER

*v.*

### EUGENE S. PIKE *et al.*

*Filed at Ottawa January 25, 1889.*

1. CONVEYANCE—*subject to pre-existing rights—construed as to extent of grant.* The owner of a lot of ground in a city leased the same for a term of years, after which he conveyed the premises to B, as trustee. In a proceeding by the city to condemn a designated part of the land for the purpose of widening a street, compensation and damages were awarded to the reversion and to the leasehold interest, and the city took possession without payment. B, the trustee, in a suit against the city, recovered judgment for the sum awarded to him, with interest from the time possession was taken. Pending a motion for a new trial, by agreement with the city, the trustee executed a deed to the city for the portion condemned, which was placed in escrow until payment of the judgment. The deed recited that its purpose was to ratify the condemnation proceeding, but that it should not affect the lessee. Afterward, the trustee conveyed the entire premises to L., the deed subject on its face to such rights as the city might have acquired to the part condemned, "by deed, condemnation proceeding, judgment or otherwise," and also transferred to L. the judgment against the city. On payment of the judgment, the city obtained and placed the trustee's deed on record : *Held,* that the city acquired the title to that portion of the lots condemned, and that L. did not, by his deed, take anything more than the residue.

2. PURCHASER—*with notice—by recitals in deed.* The owner of a lot. of ground executed to the city in which it was situate, a deed for a designated part of the premises, placing the deed in escrow, not to be delivered until the payment of a judgment in his favor, against the city. Afterward the same grantor conveyed the entire lot to another, subject on the face of the latter deed, to such rights as the city might have acquired by "deed, condemnation proceeding, judgment or otherwise." It was *held,* the latter grantee took with full notice of the existence and contents of the judgment and of the deed left in escrow, and in subordination to the rights of the city.

3. DEED IN ESCROW—*when it becomes operative.* A deed placed in escrow conveys nothing until the conditions for its delivery are performed and the deed delivered, after which it will take effect as if it had been delivered immediately to the grantee, and no act can hinder or prevent this effect.

4. ARBITRATION AND AWARD—*of the submission, and the award—and what embraced therein.* A lease of a tract of land contained a covenant of renewal at the election of the tenant, the covenant providing that the land, exclusive of the buildings placed thereon by the tenant, should be appraised by arbitrators, in order to furnish a basis for fixing the annual rental. Before the lease had expired or notice given by the tenant of his desire to renew the same, the city in which the land was situate had acquired the right and title to a certain designated part of the premises for a street. The parties each chose an arbitrator, and the arbitrators being unable to agree on a valuation, in pursuance of their powers selected an umpire, who, by his written award, after reciting the use of the part acquired by the city, and stating the number of feet remaining, determined the value of the premises at a fixed sum : *Held,* that the award was valid and binding, and that it embraced only such part of the premises as the lessor then could lease.

5. LANDLORD AND TENANT — *abatement of rent — condemnation of a part of the premises for public use.* Where a part of leased premises has been taken by condemnation for a public use, the lessee or his assigns will be entitled to an abatement or rebate of the rent, to the extent of the fair rental value of the part of the land so taken, as against the original lessor, or his grantee, from the time the latter commences to take the rents, to the termination of the lease.

6. SAME — *extent of abatement — interest on condemnation money.* Where the reversion of leased real estate is severed by the condemnation of a part thereof for a street and a conveyance of the residue, the tenant will be entitled to an abatement of the rent according to the value of the several parts of the land.

7. SAME—*covenant for renewal of lease—as running with the land, so as to bind grantee of the reversion, in whole or in part.* A covenant on the part of a lessor to renew a lease to the lessee or his assigns at the

end of the term, on certain conditions, is one that runs with the land, and will bind the grantee of the reversioner as to the part of the reversion acquired by him; but when such grantee has not succeeded to the reversion of the entire property, he will be liable only to renew the lease as to the part he owns.

8. Although the owner of real estate may have leased the same, he may sell and convey one part of his reversion to one person and the residue to another; and the grantee of the reversion will be liable on his grantor's covenant to renew the lease, for the reason such covenants run with the land. Such covenant, however, is divisible.

9. So where the owner of land, after giving a lease containing a covenant of renewal, makes a conveyance of a part of the demised premises, his grantee will only be liable to renew the lease as to the part conveyed to him; and when a person ceases to own a given part of the reversion, he will no longer be liable on the covenant to renew the lease, as that liability will pass with the title to the land.

10. SAME—*renewal lease—tender and acceptance thereof.* Where the owner of land, in a lease thereof for a term of years, covenants to renew the same on notice by the lessee or his assigns, but is afterward divested of a part of the land by judgment of condemnation for the widening of a street, and then conveys his remaining interest therein before the original lease expires, a tender by his grantee, to the tenant, of a renewal lease for all the premises owned by him, will be treated as a delivery thereof, and if it is accepted, it will be valid and binding on the parties thereto, although the covenant of renewal may not thereby be fully satisfied.

11. If a tenant entitled to a renewal lease, signs and retains one sent to him as a tender, and makes, signs and seals a duplicate thereof, and sends the same to the lessor, this, in law, will amount to an acceptance of the lease so tendered, notwithstanding the lessee may send with the duplicate to the lessor, a letter stating that he does not assent to the terms of the lease as to the amount of rent he is to pay. Where the deliberate acts of a party evince an acceptance of a lease or contract imposing an obligation on him to pay money, his words can not be received to a contrary intent.

12. Where the grantee of the reversion of a part of demised premises, under a covenant of his grantor for renewal, makes and sends to the tenant a lease of the part owned by him, with the intention that the tenant may accept it, and that it shall be in full discharge of his obligation as such grantee, there will be no trust or conditions about it, and the tenant's acceptance of such lease will bind the lessor to its performance from the time it is accepted.

13. And where a tenant accepts, signs and seals a lease tendered to him under a covenant therefor, his written or parol declarations, whether

19—127 Ind.

prior, contemporaneous or subsequent, in the absence of fraud, can not be received to alter or annul his obligation.

14. Where, however, a party under legal obligation to renew a lease, tenders one in renewal as a full performance, the lessee therein will be entitled to a reasonable time to obtain the opinion and advice of counsel before acceptance ; and if the lessor desires to withdraw his tender before its acceptance, he should give notice to that effect, and ask for a return of the lease. If he fails to do this, and retains a duplicate of the lease sent to him by the lessee, this will amount to a waiver of any right he may have had to withdraw the tender.

15. SAME—*severance of reversion—rights and liability of subsequent grantee.* Where the owner of lots, after having given a lease of the entire property, containing a covenant for renewal, conveys a portion of the premises for the purpose of widening a street and the residue to another person, the latter will not be responsible to the tenant or his assignee for any injury to the leasehold interest occasioned by the severance of the reversion, by the deeds of the original lessor or owner. In such case, the last named grantee of the reversion will become landlord as to the part conveyed to him, and, as such, will be entitled to the rent therefor, and for that part only.

16. EMINENT DOMAIN—*compensation as between leasehold and reversionary interests—presumption — each considered independently of the other.* On the condemnation of leased property, the damages are not assessed upon the idea that the relation of the value of the leasehold and reversionary interests are to perpetually remain as fixed by the terms of the lease, but upon the idea that the sum assessed is a fair and adequate compensation for the entire prospective values of those interests at the date of the assessment.

17. And in such case, the presumption is that each interest is fully compensated, according to the law, for the injury it sustains by reason of the taking ; and in no view, where the property is leased, is the one interest to be burdened with making good the loss sustained by the other interest by reason of the taking. Hence, in a proceeding to apportion the rents to be paid by the tenant, it is wholly immaterial whether the condemnation money to the one or to the other is less than it ought to have been.

18. SAME — *waiver of error in proceeding by land owner.* Where a land owner, a part of whose land is sought to be condemned for public use, brings suit to recover the compensation and damages awarded to him for the property taken or damaged, and recovers judgment therefor, which is paid, he will thereby waive all right to object to the validity of the proceeding to condemn. He can not have both the property and its value.

19. So where the land owner, after the recovery of judgment for the value of his property taken or damaged, gives a deed to the city taking

his lots, conveying the property condemned, and places the same in escrow, to take effect on the payment of his judgment, and the same is paid, his acceptance of the money and the making of his deed will estop him from questioning the validity of the judgment of condemnation.

20. SAME—*reversal in part—its effect upon the judgment.* In a proceeding to condemn land to widen a street, and to assess benefits with which to pay damages for the land taken, the reversal of the judgment of confirmation of special assessments, for an omission to specially assess a street horse railway in common with other property benefited, will not affect the assessment of damages to the property sought to be taken or damaged.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

The following statement, prepared by the Appellate Court, brings out the facts sufficiently for the comprehension of the questions discussed by the Appellate Court and this court upon this record:

In 1866, A. Nisbet Turnbull, being the owner in fee of certain parcels of land in the city of Chicago, by an indenture of lease, demised to James H., George S. and Chauncey T. Bowen, five lots, by the following description: "Lots numbered one (1), two (2), three (3), four (4), and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter ($\frac{1}{4}$) of six (6), in block two (2), in fractional section fifteen (15), addition to Chicago, said premises being situated on the south-east corner of State and Madison streets, and constituting a square piece of ground, with frontage of one hundred feet on State street and of one hundred feet on Madison street,"—for a term commencing on July 1, 1866, and ending July 1, 1885, at an annual rental of $3200, payable in quarterly installments of $800 each. The lessees agreed to erect, within a reasonable time, first-class storehouses, to cover the entire front of said premises, and to keep said buildings insured in an amount not less than $20,000. The lessor, for himself, his heirs and assigns, covenanted with the lessees,

their administrators, executors and assigns, to pay the value of the buildings, as follows: One-third cash at the expiration of the term, and the remainder in two annual installments, in one and two years, with interest at six per cent, such value to be ascertained as follows: That the lessor and the lessees should severally appoint one disinterested real estate owner in Chicago to value the buildings, and if said two persons should differ in regard to the value, they should appoint a proper person to be umpire between them, and the decision of such two persons first named, or, in case of their disagreement, of such umpire, should be final and conclusive.

It was further provided in said lease, that if said lessees, their administrators, executors or assigns, should, as early as two years before the expiration of the aforesaid term, signify to the lessor, his heirs or assigns, their desire to take a new lease of the land aforesaid for a term of twenty years next after the expiration of the term first granted, at an annual rental equal to six per cent upon the value of said land at the end of said term, the said lessor, his heirs or assigns, instead of paying for said buildings at the end of said first term, should and would make and execute to said lessees, their heirs or assigns, a new lease of said premises for a term of twenty years next after the expiration of the said first term, at an annual rental equal to six per cent of the value of the land (exclusive of the buildings) at the end of said first term, such new lease to contain all the covenants contained in said first lease except the covenants for the renewal of the lease and for the purchase of the buildings, and also to contain a covenant, that at the expiration of the term named in said new lease, said lessor, his heirs or assigns, would pay to said lessees, their executors, administrators or assigns, such a sum of money, cash in hand, as the buildings then on said premises should be fairly worth for building materials; that for the purpose of such new lease the value of said land at the expiration of said first term should be fixed and determined conclusively by ap-

praisal of persons of the character aforesaid, to be appointed in the manner aforesaid, at least one month before the expiration of said first term; that the annual rental under said new lease should be a sum equal to six per cent of the value so determined. The lessees further agreed to pay all water rates, taxes and assessments.

The lease also provided, that if any installment of rent should remain unpaid for thirty days, the lessor might sell at auction, to the highest bidder, all the buildings and improvements on said premises, and all the right, title and interest of the lessees in the demised premises, which sale should be a perpetual bar to the rights of the lessees. The lease contained no provision prohibiting an assignment thereof, nor requiring the assent of the lessor to any assignment. After the making of this lease, and on October 2, 1866, A. N. Turnbull conveyed the leased lots, with others, to Henry C. Turnbull, trustee.

About 1868 a project was started to widen State street, (from Madison to Jackson street, to a width of one hundred feet,) by taking twenty-seven feet off the west end of the lots on the east side of State street, and by an agreement between the trustee and the lessees the erection of permanent improvements on the demised lots was postponed until the proceeding to widen State street should be completed or the project abandoned. The city prosecuted its proceedings for widening, so that in 1870 net damages to the reversion of the five lots for the twenty-seven feet taken off from the west end thereof were awarded, aggregating $26,802.80, and to the leasehold the sum of $700. These damages were not paid by the city, and to prevent the city from taking possession of the twenty-seven feet before paying, a fence was kept up by the tenants, at the request of the landlord's agent, till in the year 1873, when the city was allowed to remove the fence and improve the land taken for the street, under an agreement with the owner that such action should not change the legal status or prejudice

the rights of ownership. The tenants had, prior to the removal of the fence, built on the lots on the new line of State street.

Of the assessment made by the city for benefits on property not injured or diminished by the improvement, something more than one-half the aggregate was collected, but the amount awarded to the tenants, or to the owners of the reversion of the lots in question, was not tendered to be paid, and no notice that sufficient money for that purpose was in the hands of the city treasurer was ever given in the corporation newspaper, as required by section 16, chapter 7, of the city charter, under which the proceeding was had, but the city improved the twenty-seven feet as part of the street, and continued to use it as such.

In July, 1876, Turnbull brought suit against the city in the United States Circuit Court for the Northern District of Illinois, to recover the damages awarded to the reversion, and in May, 1877, he recovered a judgment for the amount of such damages, and for the interest thereon from the time the city had taken possession of the land. This judgment was entered after trial and pending a motion for a new trial, by stipulations between Turnbull and the city, by which it was agreed that Turnbull should execute a conveyance of the twenty-seven feet to the city, which should be delivered to the corporation counsel, to be held in escrow until the city paid the judgment. The conveyance was executed, and contained a clause reciting that the premises conveyed were "to be used as a part of State street, this conveyance being made for the sole purpose of ratifying and confirming certain condemnation proceedings heretofore instituted by said city of Chicago, under which possession of said premises had been taken by said city of Chicago. This deed is in no way to affect the rights of any lessees of the premises, but is intended to leave the rights of all parties the same as though said city held said premises solely under said condemnation proceedings."

After the damages for taking the land had been fixed in the condemnation proceeding, the tenants claimed that they should be allowed a rebate from the rent, but after some discussion the matter was passed, and the tenants continued to pay the full rent reserved in the lease as it became due, but under protest and claim that a rebate should be allowed.

On April 10, 1878, Turnbull, the trustee, sold and conveyed to Levi Z. Leiter the lots described in the lease to the Bowens (with other lots), "subject, however, to such rights as the said city of Chicago may have acquired to the west twenty-seven feet of said lots as a part of State street, by deed, condemnation proceeding, judgment, or otherwise." Turnbull, by an agreement of the same date, for a consideration of $35,000, assigned to Leiter the judgment against the city in the United States court. About June 25, 1879, the city paid to Leiter the amount of the judgment in the United States court, and the conveyance from Turnbull to the city for the twenty-seven feet was then placed on record. By means of various *mesne* conveyances, the Bowen lease became the property of appellant, Eugene S. Pike, on July 1, 1881.

After the conveyance to Leiter, the tenants under the Bowen lease, including Pike, continued to pay the full rent reserved in the lease, but always under protest and claim of rebate, but no specific amount that should be rebated was mentioned, and no negotiations were had with Leiter on the subject.

On April 19, 1883, Pike, desiring to secure a renewal of the lease under the terms thereof, served on Leiter a notice addressed to him and to the owners and claimants of lots 1 to 5 in B. S. Morris' subdivision, aforesaid, at the south-east corner of State and Madison streets, constituting a square piece of ground, with a frontage of one hundred feet upon State street and one hundred feet on Madison street; recites the making of the lease by A. Nisbet Turnbull to the Bowen Brothers, July 2, 1866, of said premises, describing them as in the original lease, and the provision in said lease in reference to a

renewal, and the requirement therein as to notice; that Pike is the owner, by purchase and agreement, of said lease, and as such owner signifies his desire to take a new lease of the land aforesaid, for the term of twenty years next after the expiration of the original term, in the manner provided in said original lease. On June 5, 1883, Leiter replied to said notice, as follows:

"*Eugene S. Pike, Esq.:*        "CHICAGO, *June 5, 1883.*

"DEAR SIR—In your notice to me, dated April 2, 1883, given by you, as assignee of the lease formerly held by James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots 1, 2, 3, 4 and 5, in B. S. Morris' subdivision of original lots numbered two (2) and three (3), and the north quarter ($\frac{1}{4}$) of lot numbered six (6), in block number 2, fractional section 15, addition to Chicago, dated July 2, 1866, you state that you desire to take a new lease of the land aforesaid, for a term of twenty years next after the expiration of the term granted by said lease to the Bowens.

"As you are aware, the west portion of said lots (being the west twenty-seven feet, more or less,) was long since condemned by the city of Chicago, for the purpose of widening State street, and has for many years been used as a part of State street, and can not, therefore, be included in any new lease given by me.

"If you desire to renew the lease upon that part of said lots not condemned by the city for State street, for an additional term of twenty years from the expiration of the old lease, you will please notify me to that effect in writing, before July 1, proximo.        "Yours very truly,        L. Z. LEITER."

To this letter Pike replied as follows:

"*L. Z. Leiter, Esq.:*        "CHICAGO, *June 8, 1883.*

"DEAR SIR—Yours of the 5th inst. at hand, and in answer will say, that in my notice to you for a new lease I followed

the language of the original, that vagueness and ambiguity of expression might be avoided, and every doubt of proper and sufficient notice silenced. If it is true, as you assert, that the city of Chicago has legally condemned any portion of this property, in that case I desire a new lease of the uncondemned part. The laws of the State make ample provision to cover such an emergency. If, however, no part of said property has been legally condemned, the notice for a new lease is intended to cover the exact property, in its entirety, embraced in the old lease.

"Very resp'tly yours, EUGENE S. PIKE."

No further communication passed between the parties on the subject of the renewal lease until April 29, 1885, when Leiter wrote Pike as follows:

"*Eugene S. Pike, Esq.:*

"DEAR SIR—You are hereby notified that I have selected Van H. Higgins, Esq., to act as appraiser on my part, under the provisions of the lease from A. Nisbet Turnbull to James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots 1 to 5, inclusive, in B. S. Morris' subdivision of original lots 2, 3, and north one-quarter ($\frac{1}{4}$) of 6, in block 2, in fractional section 15, addition to Chicago, dated July 2, 1866.

LEVI Z. LEITER."

Pike replied by the following notice:

"*Levi Z. Leiter:* "CHICAGO, ILL., *May 2, 1885.*

"DEAR SIR—You are hereby informed that I have chosen Potter Palmer, Esq., to act for me as appraiser, under the provisions of the lease made by A. Nisbet Turnbull to James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots 1 to 5, inclusive, in B. S. Morris' subdivision of original lots 2, 3, and north one-quarter ($\frac{1}{4}$) of 6, in block 2, in fractional section 15, addition to Chicago, dated July 2, 1866.

"Very truly yours, EUGENE S. PIKE."

Said appraisers were unable to agree upon the value of the premises, and by the following instrument they appointed Mark Skinner to be umpire:

"WHEREAS, on the second day of July, A. D. 1866, A. Nisbet Turnbull, of Baltimore, Maryland, as party of the first part, and James H. Bowen, George S. Bowen and Chauncey T. Bowen, as parties of the second part, of the city of Chicago, State of Illinois, executed a lease of that date for certain premises in said city of Chicago, known as lots numbered one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter of six (6), in block two (2), in fractional section fifteen (15), addition to Chicago, said premises being situate on the south-east corner of State and Madison streets, and constituting a square piece of ground, with a frontage of one hundred feet on State street and one hundred feet on Madison street.

"And whereas, in and by said lease, said lessees, James H., George S. and Chauncey T. Bowen, and their assigns, have a right of renewal for the term of twenty years, on giving notice as required by said lease, and by procuring an appraisement of the value of said lands, to fix the amount to be paid as rent, on a basis of six per cent annually upon the value of said land.

"And whereas, Levi Z. Leiter has become the owner of said lands, and Eugene S. Pike has become the assignee and owner of the interests of said Bowens under said lease.

"And whereas, said Leiter has chosen as an appraiser to fix the value of said lands, under said lease, as such owner thereof, Van H. Higgins, to act for and represent the owner in appraising said lots and lands.

"And whereas, said Pike has chosen as appraiser to fix the value of said lands under said lease, as the owner of leasehold estate and of the interests of said Bowens under said lease, Potter Palmer, to act for and represent the owner of said

leasehold estate in appraising said land and lots under said lease, and in pursuance of its terms.

"And whereas, both of said appraisers have consented to act in the premises; and whereas, after canvassing the matters submitted to them, and trying to agree upon the valuation thereof, they have been unable to agree upon the value thereof.

"And whereas, in and by the terms of said lease it is stipulated and agreed that in such case said appraisers or parties chosen to fix the value of said premises shall choose a proper person to be umpire between them.

"Now, therefore, in pursuance of the terms of said lease, and the authority thereby conferred upon the undersigned by the terms thereof, and by the owners of said land and said leasehold estate, we, the undersigned, do hereby appoint the Hon. Mark Skinner to be umpire between us, to decide as to the value of said lots and lands under and in pursuance of the terms of said lease.

"Witness our hands and seals, this 8th day of May, A. D. 1885.                                          VAN H. HIGGINS,   [SEAL.]
                                                        Appraiser chosen by Leiter.
                                                      POTTER PALMER,   [SEAL.]
                                                        Appraiser for Mr. Pike."

Afterwards, Skinner made an award in writing, in the following terms:

"Whereas, on the 2d day of July, A. D. 1866, A. Nisbet Turnbull, of Baltimore, Maryland, as party of the first part, and James H. Bowen and George S. Bowen and Chauncey T. Bowen, as parties of the second part, of the city of Chicago, State of Illinois, executed a lease of that date for certain premises in said city of Chicago, known as lots numbered one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter of six (6), in block numbered two (2), in fractional section fifteen (15), addition to Chicago,—said premises being situate on the south-east corner of State and Madison streets,

and constituting a square piece of ground, with a frontage of one hundred (100) feet on State street, and of one hundred (100) feet on Madison street.

"And whereas, in and by said lease, said lessees, James H. Bowen, George S. Bowen and Chauncey T. Bowen, and their assigns, have a right of renewal for the term of twenty (20) years, on giving notice as required by said lease, at a rental of six (6) per centum annually upon the value of said premises, to be determined by an appraisement in the manner described in said lease; and whereas, Levi Z. Leiter has become the owner of said lands, and Eugene S. Pike has become the assignee and owner of the interest of said Bowens under said lease.

"And whereas, said Leiter has chosen as an appraiser, to fix the value of the said lands under said lease, as such owner thereof, Van H. Higgins, to act for and represent the owner in appraising said lots and lands.

"And whereas, said Pike has chosen as appraiser to fix the value of said lands under said lease, as the owner of the said leasehold estate, and of the interests of said Bowens under said lease, Potter Palmer, to act for and to represent the owner of said leasehold estate in appraising said lands and lots under said lease, and in pursuance of its terms.

"And whereas, both of the said appraisers have consented to act in the premises; and whereas, after canvassing the matters submitted to them, and trying to agree upon the valuation thereof, they have been unable to agree upon the value thereof.

"And whereas, in and by the terms of said lease, it is stipulated and agreed that in such case said appraisers, or parties chosen to fix the value of said premises, shall choose a person to be umpire between them.

"And whereas, the said Van H. Higgins and Potter Palmer, in pursuance of the terms of said lease and the authority thereby conferred upon them by the terms thereof, and by the

owners of said land and said leasehold estate, have appointed. Mark Skinner to be umpire between them, to decide as to the value of said lots and lands, under and in pursuance of the terms of said lease.

"Now, therefore, I, the undersigned, Mark Skinner, having made examination into the matter submitted to me, as aforesaid, and ascertaining that a portion of said premises, to-wit, a strip of land twenty-seven (27) feet in width from east to west, by one hundred (100) feet in length from north to south, from off the west end of said lots one (1), two (2), three (3), four (4) and five (5), is now apparently used and occupied as a part of State street, leaving the premises now one hundred (100) feet front on State street by seventy-three (73) feet deep, do hereby decide the value of the same at the day of the date hereof to be $300,000.

"Dated at Chicago, this 29th day of May, A. D. 1885.

Mark Skinner."

Thereupon, negotiations were had between Pike and Leiter as to the form of the new lease. Various drafts of leases were prepared and submitted by each party to the other, and interviews were had between the parties and their respective counsel, but the parties failed to agree upon the renewal lease. Pike claimed that the award of Skinner was a valuation of the whole hundred feet square, and insisted that Leiter should make him a lease of one hundred feet square. Leiter claimed that the award was a valuation of the east seventy-three feet only, and that he had no title to more than the east seventy-three feet, and he insisted that he could not, and would not, make any lease covering the west twenty-seven feet of the lots.

On June 30, 1885, Pike assigned the Bowen lease to one Raspin R. Cherry, who immediately notified Leiter of the assignment. This assignment was made by Pike so as to avoid personal liability on the covenants of the renewal lease, but no objection to the assignment was made by Leiter, and negotiations for the renewal lease went on in Cherry's name,

but under the direction of Pike's counsel. Leiter, in the first week in July, caused to be prepared and submitted to Cherry a draft of lease, describing the land as described in the Bowen lease, but as subject to the rights of the city in the twenty-seven feet strip, and having some variation in language from the Bowen lease, and fixed the rental at $18,000 per annum. This was rejected, as follows:

"*L. Z. Leiter, Esq.:*                    "CHICAGO, *July 8, 1885.*

"Dear Sir—I have read the last lease sent to me, and can not accept it. What I desire is just such a lease as you are required to make me by the terms of the old lease—no more, no less.

"In negotiations thus far I have acted in the spirit of compromise, but I now decline to make any changes, and require that no deviation whatever shall be made in the language or significance of the new lease not provided for in the old one.

Respectfully,                    RASPIN R. CHERRY.
By Robert C. Givins, *his Att'y in fact.*

"I concur in the above.                    EUGENE S. PIKE."

Nothing further was done between the parties till on September 11, 1885. Leiter sent to Cherry a renewal lease, signed and sealed by him, (Leiter) containing a covenant to pay a rental of $18,000 per year, with provisions which are conceded to have been in all respects as required by the terms of the Bowen lease, and describing the land demised as it is described in the following letter, which accompanied the lease:

"*Raspin R. Cherry, Esq.:*                    "CHICAGO, *July 1, 1885.*

"Sir—I, being advised that on the 30th day of June, 1885, you became the owner, by assignment, of a certain indenture of lease, bearing date the second day of July, A. D. 1866, and recorded in the office of the recorder of deeds for the county of Cook and State of Illinois, on the 9th day of November, 1866, in book 364 of deeds, at page 441, made by A. Nisbet

Turnbull, then of Baltimore county, in the State of Maryland, to James H. Bowen, George S. Bowen and Chauncey T. Bowen, then of the county of Cook and State of Illinois, of all those premises situate in the city of Chicago, in the county of Cook and State of Illinois, known and described as follows, to-wit: Lots one (1), two (2), three (3,) four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter of lot six (6), in block two (2), in fractional section fifteen (15), addition to Chicago; and I having become, on the 10th day of April, A. D. 1878, the owner, by assignment and conveyance from the lessors in said above mentioned lease, of said lease, and of the reversion of a part of the real estate described in said lease, namely, of said lots one (1), two (2), three (3), four (4) and five (5), of B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter ($\frac{1}{4}$) of original lot six (6), all in block two (2), in fractional section fifteen (15), addition to Chicago, (said Morris' subdivision being at the south-east corner of Madison and State streets in said city of Chicago); subject, however, to such rights as the said city of Chicago may have acquired to the west twenty-seven (27) feet of said lots one (1) to five (5), inclusive, (as originally laid out,) as a part of State street, by deed, condemnation proceedings, judgment or otherwise; and the said lease containing an agreement on the part of the lessor, his heirs or assigns, to make a new lease of the premises in said original lease described, for the term of twenty years next after the expiration of the term granted by said original lease, upon compliance with certain preliminary conditions by the lessees in said original lease, their executors, administrators or assigns, which conditions have been complied with, and also upon terms, the ascertainment of which is provided for in said original lease, and which have accordingly been ascertained as to that part of said land in said original lease described, conveyed to me as above mentioned, and of which I am now the owner by the above mentioned assignment and

conveyance, and I having no other right, title or interest in the lands described in said original lease than that derived and acquired as above set forth: Therefore, in performance of said agreement for a new lease, so far as I am, or the land owned by me is, chargeable with the burden of fulfilling said agreement for a new lease, I hereby tender to you for acceptance, a lease, duly executed by myself, of all those premises, situate in the city of Chicago, in the county of Cook and State of Illinois, known and described as follows, to-wit: Lots one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter ($\frac{1}{4}$) of original lot six (6), all in block two (2), in fractional section fifteen (15), addition to Chicago, exclusive of all the buildings standing thereon, (said premises being situate on the south-east corner of State and Madison streets, and constituting a square piece of ground, with a frontage of one hundred feet on State street and one hundred feet on Madison street); and subject, however, to such rights as the said city of Chicago may have acquired to the west twenty-seven (27) feet of said lots one (1) to five (5), inclusive, (as originally laid out,) as a part of State street, by deed, condemnation proceedings, judgment or otherwise, for the term of years, and containing the covenants, agreements and other provisions contemplated by the agreement in said original lease contained, for a new lease.

Very respectfully yours,

LEVI Z. LEITER."

On receipt of the letter and lease, Cherry wrote to Leiter, as follows:

"CHICAGO, *September 11, 1885.*

*"Mr. L. Z. Leiter:*

"Sir—I have submitted the lease, and your communication with reference thereto, left with me this morning, to my attorney, for his advice; but owing to his engagements, I am unable to get an answer to-day. I write this note to say that

as soon as he gives me an opinion I will decide whether or not to accept the lease and its provisions as you have prepared them, and meanwhile you will please consider the question as in abeyance.     Yours respectfully,    RASPIN R. CHERRY."

To which Leiter replied:

"*Raspin R. Cherry, Esq.:*     "CHICAGO, *September 12, 1885.*

"SIR—In reply to your communication dated yesterday, but received by me to-day, I have to advise you, that having tendered to you the lease referred to by you, I can not consider any question as in abeyance, as you request, but I have held myself, since making the tender, and I continue to hold myself, entitled to assert such rights in respect to yourself and the property described in said lease, as may be given me by law in consequence of my making you the tender and of your action thereupon.

"I decline to enter into any stipulation, or to have any understanding with you, which will in any way modify or change the effect or result of my communication to you tendering you the lease.     Very respectfully yours,

L. Z. LEITER."

On September 15, Cherry sent to Leiter a duplicate copy of the lease, duly signed and sealed by him, (Cherry,) and accompanied by the following letter:

"*Mr. L. Z. Leiter:*     "CHICAGO, *September 15, 1885.*

"SIR—In answer to your communication dated July 1, 1885, and left with me September 11, 1885, with a copy of a lease dated July 1, 1885, to which your signature is appended, I answer as follows:

"As stated in your communication, I was, on the 30th day of June, 1885, the owner, by assignment, of a certain lease bearing date July 2, 1866, made by A. Nisbet Turnbull to James H. Bowen, George S. Bowen and Chauncey T. Bowen,

of lots one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter (N. $\frac{1}{4}$) of lot six (6), in block two (2), in fractional section fifteen (15), addition to Chicago, the same having been assigned to me by Eugene S. Pike, who was the assignee of the said James H. Bowen, George S. Bowen and Chauncey T. Bowen, and which lease was for a period of time expiring July 1, 1885, and with a provision for the extension thereof for a term of twenty years next after the expiration of the term granted thereby, upon the lessee giving two years and six months' notice, in writing, of the desire so to do, at an annual rental equal to six (6) per cent upon the value of said land at the end of the term thereby granted.

"Also, as stated in your communication, said premises were conveyed to you by deed of April 10, 1878, which was executed by Henry C. Turnbull personally, and as executor and trustee, as therein mentioned, Alexander Nisbet Turnbull and others, as heirs of the lessor, subject to such rights as the city of Chicago may have acquired to the west twenty-seven feet of said lots one (1) to five (5), inclusive, as originally laid out as a part of said street, by deed, condemnation proceedings, judgment or otherwise, and also subject to said lease and its provisions, with covenants of warranty, except as to said lease and agreement, and any taxes or assessments levied or charged on said premises, or against the right and interests of said city of Chicago or the public, which they, or either of them, now have or may hereafter acquire in said west twenty-seven feet of said lots one (1) to nine (9), both inclusive, in said Morris' subdivision.

"And I also call your attention to the fact that your grantors, by quitclaim deed dated in January, 1877, to the city of Chicago, conveyed and quitclaimed all interest in the west twenty-seven feet of sub-lots one (1) to six (6), inclusive, in B. S. Morris' subdivision of original lots (2) and three (3), and the north one-quarter (N. $\frac{1}{4}$) of lot six (6), in block two (2), in

fractional section fifteen (15), addition to the town of Chicago, in Cook county, Illinois, said above described premises to be used as a part of State street, the conveyance being made for the purpose of ratifying and confirming certain condemnation proceedings theretofore instituted by the city of Chicago, under which possession of said premises had been taken by the said city of Chicago, with the provision that the deed was in no way to affect the rights of any lessees of said premises, but was intended to leave the rights of all parties the same as though said city held said premises solely under said condemnation proceedings.

"And I further call your attention to the fact that the condemnation proceedings mentioned in the said deed were void, and conferred no rights upon the city to the use of the west twenty-seven feet of said lots, and therefore, by the express provision of said deed, the rights of the lessees and their assignees were not affected by the proceedings to condemn or the deed to the city of Chicago.

"I further call your attention to the fact that after you received the deed from the said Turnbull, you waived any objection to the condemnation proceedings, and ratified and confirmed the same, so as to prevent you from asserting any claim or title to the said west twenty-seven feet, and for this reason it is that you are unable, as you state in your communication, to perform the covenant in said original lease to give a new lease, covering the whole of said lots described in the original lease, for the extended term therein mentioned.

"I further call your attention to the fact that the notice required by the lease, of the election to take the extended term, having been given on the 29th day of May, 1885, Mark Skinner, chosen as umpire by two appraisers, selected by you, as owner, and Eugene S. Pike, as assignee of the said Bowens, according to the provisions of said original lease, decided the value of the premises described in the original lease, to be three hundred thousand dollars ($300,000), and that thereby

the said Eugene S. Pike was entitled to a lease for the premises described in said original lease for the renewed or extended term, at the said appraised value of $300,000, and I succeeded to the rights of said Eugene S. Pike, as his assignee.

"Now, therefore, I give you notice that I accept the lease signed by you, bearing date July 1, 1885, and left with me on the morning of September 11, 1885, as a lease of a part of said lots described in the original lease, and being all of the said lots that you are able to lease to me and furnish to me the use and possession thereof, by reason of your own wrongful act in the premises; and I further give you notice, that in accepting said lease I do not agree to pay the sum of eighteen thousand dollars ($18,000) per annum, being six (6) per cent interest on the sum of $300,000, but shall claim that I am entitled to an abatement therefrom of the fair rental value of the west twenty-seven (27) feet of said lots, as described in the original lease; and I further give you notice, that I do not accept the said lease as a full performance of the covenant in said original lease to grant an extended term, but only as a part performance thereof, and that you will be held liable for such damages as the law may allow for the non-performance of said covenant in full, to whoever may have a legal cause of action therefor.

"I further give you notice, that I have signed the lease left with me on the morning of September 11, 1885, and had prepared a duplicate thereof, which I have signed and herewith send to you, so that you may affix your signature thereto and retain the same as a duplicate copy of said lease.

RASPIN R. CHERRY."

On September 24, 1885, Leiter sent a letter to Cherry, in which he notifies Cherry that he holds Cherry's communication to him, dated September 15, 1885, a rejection of the lease dated July 1, 1885, which Leiter tendered to Cherry on the 11th of September, 1885, by a communication bearing date July 1, 1885, and that Cherry's right, title and interest, as a

tenant, in the lands and premises described in said lease tendered to and rejected by Cherry, having expired and determined, "I hereby demand the immediate possession of the following described premises," describing them; notifies Cherry that he is ready to pay him, as assignee of the original lease, the value of the building, and that he has appointed Jonathan Clark to value said building, and requests Cherry to appoint a person to act with Clark for the purpose of proceeding to the acertainment of the value of said building, as provided in the lease.

On September 25, 1885, Cherry, by an instrument under his hand and seal, transferred to Pike the renewal lease and also the original lease, with all rights and covenants in said leases contained, and with all claims, actions and causes of action arising out of said leases; and September 30, 1885, and on every quarter day since that time, Pike tendered to Leiter the amount of rent falling due as the same is reserved in the renewal lease, but at all times under protest and claim that he is entitled to the rebate of the fair rental value of the west twenty-seven feet; but Leiter has at all times refused to receive the rent so tendered, and has insisted that the lease made by him and tendered to Cherry was not binding, and never became operative as a lease.

The premises were in September, 1885, in the actual possession of certain parties, as the tenants of Pike and of Pike's lessees, and on September 28, 1885, after having sued for possession, Leiter commenced an action for forcible entry and detainer against said occupants, and, upon petition, Pike became a party defendant to said suit, and about the same time a suit in ejectment was commenced by Leiter, in the Superior Court of Cook county, against the same parties.

In June, 1886, Pike filed a bill, and, by leave of court, on December 20 thereafter, an amended bill, in which he claimed that he was entitled, as against Leiter, for the over-paid rent, and also for the amount received by Leiter from the city for

the portions taken by the city for widening State street; that the renewal lease by Leiter was not a full compliance with the covenants contained in the original lease; that he was entitled to an abatement of the rent for the fair rental value of the twenty-seven feet; that the renewal lease executed by Leiter was accepted by Cherry, and has ever since been binding on Leiter, and is a valid lease, and that the only question left open in said lease is as to the amount of rent. Complainant is to pay for the premises therein described, but if the court should be of opinion that said renewal lease was a performance and fulfillment of Leiter's obligations in respect of making a new lease, and Skinner's award was a valid award, and the assignee of the original lease became liable to pay $18,000 per year as rent of the premises described in said renewal lease, then complainant offers to pay all rent accrued under said renewal lease; also, asks for a construction of the Skinner award, and if such award was a valuation of only the east seventy-three feet, that it be declared void, and that a valuation of the premises be made under direction of the court; also, prays for an injunction against the prosecution of the suit at law to turn Pike or his tenants out of said premises.

Leiter answered this bill, and filed a cross-bill, in which he included as defendants, Schlesinger and Mayer and Parmly and Sweet, who were lessees of Pike, setting up the facts, and insisting that Skinner's award was a valuation of the east seventy-three feet, only, of the lots described in the original lease; that he (Leiter) had obtained title to only that portion of said lots; that he was always ready to fulfill his obligations in respect to said renewal lease; that the lease tendered to Cherry was a complete performance of his obligations in that regard; that Cherry rejected said lease; that the only obligation remaining on Leiter was to pay the just valuation of the buildings on said land; that he was ready to do so; prayed that the renewal lease might be declared inoperative as a lease, and might be ordered surrendered up to be cancelled,

and that it might be adjudged that Pike, and the defendants who claimed under him, acquired no valid interest by said instrument, and that all the rights of Pike, and those claiming under him, through the original Bowen lease, might be declared terminated, and Leiter put in possession of the premises in controversy, and that the value of the buildings be ascertained, etc. The cross-bill was answered by all the defendants thereto, Pike's lessees setting up some facts supposed to offset their respective rights, which it is unnecessary to state.

On the hearing, upon the pleadings and the facts above set out, the court entered a decree finding various facts, and allowing to Pike, by Leiter's consent, $2880, as an abatement of the rent paid by Pike to Leiter from the time Pike became the owner of the Bowen lease until its expiration, for the fair rental value of the twenty-seven feet taken by the city, and adjudging that Pike is not entitled to have any other relief; that the renewal lease executed by Leiter was a full offer of performance on his part of the obligations resting on him under the Bowen lease, and was rejected by Cherry, and never became operative as a lease, and that neither Cherry nor either of the defendants to the cross-bill acquired any rights thereunder, and enjoining them perpetually from setting up any rights thereunder, and that Leiter is entitled to the possession of the premises, and proceeds to settle the rights of the parties with reference to the rent of the premises since the expiration of the Bowen lease, and with reference to the value of buildings on the land. From this decree an appeal was prosecuted to the Appellate Court by all the defendants to the cross-bill.

The Appellate Court reversed the decree of the Superior Court, except as to the allowance of the rebate for $2880, and remanded the cause, with directions to the Superior Court to enter a decree in conformity with the opinion of the Appellate Court then filed. From that judgment Leiter appealed to this court, and assigned errors. Cross-errors were also assigned by Pike and Parmly and Sweet.

The opinion of the' Appellate Court is as follows :

MORAN, P. J. "Upon the facts set out in the foregoing state-ment, which contains all that we deem material appearing in the record of this case, three principal questions arise : First, did Leiter obtain title by the deed of conveyance made to him by Henry C. Turnbull, trustee, to anything more than the east seventy-three feet of the lots mentioned in the Bowen lease ? Second, was the award made by Mark Skinner a valid award, and was his valuation of the east seventy-three feet of the lots, or of the whole hundred feet square described in the original lease ? Third, was the lease tendered by Leiter to Cherry on September 11, 1885, accepted by Cherry, and is it a binding and subsisting lease ?

"*First*—Leiter's title rested solely on the deed made to him April 10, 1878, and that described the land in question as described in the Bowen lease, but conveyed it expressly sub-ject to such rights as the city of Chicago might have acquired to the west twenty-seven feet of said lots, as a part of State street, by deed, condemnation proceedings, judgment or other-wise. Without entering upon a discussion of the various points made by counsel for appellants as to the regularity or validity of the condemnation proceedings prosecuted by the city, or undertaking to determine what would be the condition of the title of the west twenty-seven feet of the lots in ques-tion, as affected by the condemnation proceedings alone, we are clearly of opinion that by operation of said condemnation proceeding, the possession obtained by the city, the judgment obtained by Turnbull in the United States Circuit Court for the value of the said twenty-seven feet as assessed in the con-demnation proceeding, and the delivery by Turnbull of the quitclaim deed in escrow, the city had acquired, as against Turnbull, prior to the time of the conveyance by him to Leiter, a title to the said west twenty-seven feet, and a right para-mount to use and maintain the same as a part of State street.

When Leiter obtained his deed from Turnbull, he was power-
less to change the conditions then existing with reference to
said west twenty-seven feet, and by taking the deed he as-
sumed no obligation to do so. Nor can we see that his pur-
chase of the judgment in the United States Court in any
manner affected his relation to the title of the property. The
city had, under the stipulation, the right to pay the judgment
and place the quitclaim deed on record. Leiter, by becoming
the assignee of the judgment, had the right to receive the
money when the city was ready to pay it, but if he had re-
fused to take the money when the city offered it, he could not
thereby prevent the city from putting the deed on record.

"The city then having acquired a title to the east twenty-
seven feet of the lots prior to the conveyance by Turnbull to
Leiter, it follows that Leiter obtained, by his deed, title to the
east seventy-three feet of the lots, only. No doubt the tenants
under the Bowen lease were entitled to an abatement or re-
bate of the rent, to the fair rental value of the twenty-seven
feet taken by the city, as against Turnbull, and as against
Leiter from the time he commenced taking the rent under said
lease till the termination thereof.

"*Second*—At the time Pike gave notice to Leiter of his de-
sire to take a new lease in accordance with the provisions of
the Bowen lease, both of them well knew all the facts relating
to the situation of the property and the condition of the title.
We think it clear that the appraisers selected by the parties
were not expected by either of them to value, for the purpose
of fixing a rental, the west twenty-seven feet of the lots de-
scribed in the lease, which portion of said lots was, to the
knowledge of all the parties, held and used as a public street,
under a title obtained by the city for that purpose. The no-
tices given by the parties to each other of the selection of
appraisers, stated that such appraisers were selected under
the provisions of the Bowen lease; but it must be intended
that the appraisal of the property for rental was to be of

that portion, only, of the land described in the lease which the proposed lessor had title to, and would not include a portion in use as a street, and to which the lessor had no title. The notices and the provisions of the Bowen lease constituted the submission. The purpose of the appraisal was to fix a basis for adjusting the rent that should be paid for such portion of the land as was vested in Leiter by the Turnbull deed. It is true that the instrument signed by the appraisers, appointing Skinner umpire, described the land to be appraised as the lots mentioned in the Bowen lease; but it clearly appears from the award, that the umpire was not misled by such description, and that he valued only the portion of the land which it was the intention of all the parties he should value,— that is, the east seventy-three feet of the lots mentioned in the Bowen lease.

"We do not consider the award rendered susceptible of any other construction. The west twenty-seven feet used and occupied as a part of State street is treated in the award as diminishing the land described, and, as it is said, 'leaving the premises now one hundred feet front on said street by seventy-three feet deep,' and the value of same is fixed at $300,000. The submission was a valid submission, and the award is a clear and precise answer as to the value of the land, upon which, under the provisions of the Bowen lease and the rights and obligations of the parties to the submission as they existed at the time, it was competent to fix a value. The conclusion must be, therefore, that the award was valid.

"*Third*—The yearly rental of the land to be demised by the renewal lease having been ascertained in accordance with the terms and provisions of the Bowen lease, and Pike, as assignee of said lease, having, by compliance on his part with the terms of said lease in that regard, entitled himself or his assignee to a renewal lease at the expiration of said Bowen lease, the duty of Leiter, on July 1, 1885, was one of performance. The covenant to renew the lease ran with the land, and he

was bound to discharge that covenant as to such portion of the reversion as he held as grantee. By agreement, it was competent for Pike to have accepted as performance something less than was called for by the covenant, and so Leiter might have granted something more.

"We find that there was negotiation, or perhaps it might more properly be call contention, between Leiter and Pike as to the terms of the renewal lease, and that the contention was continued after the assignment from Pike to Cherry. All efforts of the parties to agree on the draft of a lease which in any particular was a departure from the provisions of the Bowen lease, were terminated by the letter of Cherry, concurred in by Pike, and dated July 8, 1885. That letter notified Leiter that strict performance was demanded of him, and thenceforth the parties dealt at arm's length. No more drafts of leases were submitted by the one to the other for approval, but Leiter, recognizing the requirements of the situation, prepared to tender full performance of his covenant. A lease was prepared by him in strict compliance with the provisions of the Bowen lease, and describing the land demised as it was described in the conveyance from Turnbull to him. This lease, signed and sealed by Leiter, he sent to Cherry, accompanied by the letter set out in the statement of facts, in which he said, 'in performance of the said agreement for a new lease, so far as I am, or the land owned by me is, chargeable with the burden of fulfilling said agreement for a new lease, I hereby tender to you for acceptance a lease duly executed by myself, of all those premises situate in the city of Chicago,' etc. It will be observed that this is a tender of the lease for acceptance as a lease. There was no condition that the lease was to be accepted as full performance of the covenant, though Leiter's position, of course, was, that it was in fact and in law a full performance. As is said by the learned counsel for Leiter, in their brief filed in this court: 'In legal effect the simple question put  * * *  by the tender of the lease,

\*    \*    \*    was: Will you become my tenant in respect to the land described in the tendered lease, at the rental named therein, and be subject, in respect to that land and that rental, to the provisions of the tendered lease relating thereto?' The acceptance of the lease, then, as a lease of the land described in it, would necessarily constitute it a valid and subsisting lease between the parties to it, notwithstanding the fact that Pike, or Cherry for Pike, insisted that the lease was not a full performance of the covenants of the original lease, and that Leiter would be held for damages for non-performance of said covenants in full. The question of whether the covenant was performed, was and is, under the facts of this case, an entirely different one from the question, was the lease accepted.

"The tender of the lease by Leiter constituted a delivery of it. The transfer of the instrument from Leiter to Cherry was for the purpose, and with the intention, on Leiter's part, of vesting in Cherry the estate granted by the lease. This is manifest from his acts and from his words. He intended, by what he did, to accomplish a full and final performance on his part. He did not contemplate any further act of performance whatever. We find nothing in his conduct or his words that gives support to the contention of his counsel that the tender did not constitute a delivery, on his part, of the lease. There is no indication that he expected a communication assenting to the terms of the lease, but returning it to him to be then delivered by him to Cherry. Nothing less than a delivery, or offer to deliver, on his part, would be a performance of his covenant. Hence his tender was a delivery, or a tender of delivery, which, if accepted, would at once become a completed delivery of the instrument.

"But the question still remains, was the lease accepted? The acceptance of an instrument, like the delivery of it, is a matter of intention, to be gathered from the acts and words of the person to whom the instrument is offered. Now, what were Cherry's acts? After applying to Leiter to leave the question

in abeyance for a day or two, and having been refused, and told that Leiter stood on his tender of the lease, he signed and sealed the instrument which Leiter had delivered to him, and made a duplicate thereof, which he also signed and sealed, and delivered to Leiter to sign and seal and retain as a duplicate copy of said lease. Now, treating the words contained in the communication accompanying the duplicate lease, that 'in accepting the lease I do not agree to pay the sum of $18,000 per annum,' as indicating a rejection of the lease, as counsel contend they did, what, under the rule of law, must be our conclusion? If there were no inconsistent words, it will be admitted by all that the acts done by Cherry in signing and retaining the lease delivered to him, and sending a duplicate of it, executed by himself, to be signed and retained by Leiter, would be regarded as most satisfactory, if not most conclusive, evidence of his intention to accept the lease. His most solemn and deliberate acts evince an acceptance; his words are said to be inconsistent therewith.

"But saith my Lord COKE: 'When the words are contrary to the act which is the delivery, the words are of none effect, *non quod dictum est, sed quod factum est inspicitur.*' (Co. Lit. 36 a.) And in Leake on Contracts, at page 13, it is said: 'In judging of intention from a person's words and conduct, where his acts are inconsistent with his words, the former are, in general, accepted as a more reliable guide to the intention than the latter; and the conduct may, in some cases, determine the intention, even in opposition to the words.'

"Under this rule, which is based on sound reason, it is very clear that Cherry's conduct proves an acceptance of the lease by him, even allowing that the words of his letter to Leiter indicate a contrary intent. But we are of opinion that the words of the letter, when all read and considered, can not be understood as a rejection of the lease. He wrote: "I give you notice that I accept the lease signed by you, bearing date July 1, 1885, and left with me on the morning of September

11, 1885, as a lease of a part of said lots described in the original lease, and being all of said lots that you are able to lease to me and furnish me the possession of, by reason of your own wrongful act in the premises.' That is a plain acceptance of the lease in words, as being a lease of part of the lots, and all that Leiter was able to lease, just as Leiter himself contended. It may be that the words of the letter show a reluctant, grumbling, carping acceptance, but there is none the less a clear and unconditional acceptance.

"But it is contended that the words, 'I further give you notice that in accepting said lease I do not agree to pay the sum of $18,000 per annum,' was a rejection of, or refusal to be bound by, the chief agreement on the tenant's part,—*i. e.*, to pay the rental named in the lease; that this notice which accompanied the duplicate lease is to be construed with it, as two instruments executed at the same time, as parts of the same agreement. The facts here do not permit the application of the principle invoked. The letter or notice was not an agreement between the parties contemporaneous with the lease. It was not an agreement between the parties at all, and does not purport to be. Allowing it the utmost dignity that can be ascribed to it, it was but an attempt to annul the binding effect of a sealed covenant by parol expressions made by the covenantor contemporaneous with the delivery of the instrument containing the covenant. As such, it was utterly without legal consequence or effect, and could never be introduced in evidence to defeat or modify the covenant. Cherry became bound to pay the rent reserved in the lease when he accepted, signed and sealed the lease tendered to him by Leiter, and when he had done that, and had also signed and sealed a duplicate thereof, and delivered it to Leiter, he created the most solemn evidence of his agreement which is known to the law; and it is a proposition of law settled beyond controversy, that parol words, whether prior, contemporaneous or subsequent, are, in the absence of fraud, impotent to alter or annul such

an obligation.  *Chapman* v. *McGrew*, 20 Ill. 101; *Herrick* v. *Swartwout*, 72 id. 340; Chitty on Contracts, 5, 7.

"We conclude, then, that the lease tendered by Leiter to Cherry was duly accepted by him, and that it became and is a valid and subsisting lease.  The notice of Leiter that he held Cherry's communication a rejection of the lease tendered, was of no effect, and the rent reserved in the lease having been regularly tendered to him by Pike on each quarter day, as it became due, the proceedings by Leiter to get possession of the premises were in violation of his obligations under the lease. It follows that the Superior Court erred in adjudging, in the decree appealed from, that the said lease had been rejected by Cherry, and was not a valid and subsisting lease binding on Leiter, and in ordering the surrender and cancellation thereof, and in granting any of the relief granted upon Leiter's cross-bill.

"Pike prayed in his bill for a rebate of the rent paid by him to Leiter, and the decree allows to him a rebate to the amount of $2880.  We have examined the evidence introduced by Pike to establish the amount of rebate he should be allowed, and are of the opinion that the amount allowed by the court is the amount that should be allowed, and that finding of the decree will therefore be affirmed.   Leiter is entitled to receive from Pike all the accrued rent from the commencement of the term under the renewal lease, and said renewal lease will be found to be a valid and subsisting lease of the premises therein described, for the term therein named.

"As the conclusion reached will render relief under the cross-bill of Parmly and Sweet unnecessary, the same, as well as the cross-bill of Leiter, will be dismissed at Leiter's costs.

"The decree of the Superior Court is reversed, save as to the allowance of said rebate of $2880, and the case remanded to that court, with directions to enter a decree in conformity with this opinion."

Messrs. Isham, Lincoln & Beale, for the appellant:

The tenant was entitled to an abatement of rent as soon as his landlord received the condemnation money for his reversion. Sec. 18, chap. 7, of old City Charter; *Gillespie* v. *Thomas,* 15 Wend. 464; *Gillespie* v. *Meyer,* 23 id. 643.

The rent payments were voluntary, and no part thereof is legally recoverable. *Stover* v. *Mitchell,* 45 Ill. 213; *Falls* v. *City,* 58 id. 403; *Burlock* v. *Cook,* 20 Bradw. 154; *Railroad Co.* v. *Commissioners,* 8 Otto, 541; *Regan* v. *Baldwin,* 126 Mass. 485.

Leiter's obligation to Pike to renew the lease was based, not on privity of contract, but on privity of estate, and limited by the land then owned by Leiter. *Crosby* v. *Loop,* 13 Ill. 625; *Babcock* v. *Scoville,* 56 id. 467; *Astor* v. *Miller,* 2 Paige, 68.

The title to the west twenty-seven feet of the property passed to the city by estoppel, and also by deed. 3 Washburn on Real Prop. chap. 11, sec. 6.

The appraisal and award were valid and binding, and related only to the land owned by Leiter. Morse on Arbitration, 350, 208, 446.

The tender of the lease to Cherry was not a delivery. *Stiles* v. *Probst,* 69 Ill. 382; *Jordan* v. *Davis,* 108 id. 336; *Berry* v. *Anderson,* 22 Ind. 36; *Graves* v. *Dudley,* 20 N. Y. 76; *Gurdzen* v. *Besset,* 6 E. & B. 986; *Bowker* v. *Burdekin,* 11 M. & W. 128; *Davis* v. *Jones,* 17 C. B. 265; *Black* v. *Shreve,* 13 N. J. Eq. 457; *Rhodes* v. *School District,* 30 Me. 112; *Steel* v. *Miller,* 40 Iowa, 402.

Leiter's tender of performance was not unconditionally accepted. Chitty on Contracts, (11th Am. ed.) 147; *Bailey* v. *Cromwell,* 3 Scam. 71; *Duncan* v. *Charles,* 4 id. 561.

The letter showing acceptance, and also showing an intention not to be bound by the lease, must be construed together. *Stacey* v. *Randall,* 17 Ill. 467; *Gardt* v. *Brown,* 113 id. 475; *Reed* v. *Field,* 15 Vt. 672; *Warner* v. *Jacksonville,* 15 Ill. 236; *Corcoran* v. *White,* 117 id. 118; *Ditto* v. *Harding,* 73 id. 121.

Mr. C. BECKWITH, and Messrs. TRUMBULL, WILLETS, ROBBINS & TRUMBULL, also for the appellant:

Pike, by demanding a renewal lease to which he knew he was not entitled, and which Leiter had no power to make, and by his conduct, released Leiter from the obligation to give a renewal lease. *Towle* v. *Ambs,* 123 Ill. 425; *Ditto* v. *Harding,* 73 id. 117.

The refusal of Cherry and Pike, on July 8, 1885, to accept the renewal lease, offered by Leiter, of all the premises to which they were entitled, ended all negotiation, and released Leiter from any obligation to afterward give a renewal lease. *Jordan* v. *Davis,* 108 Ill. 336.

The proposed renewal lease sent Cherry on September 11, 1885, with the accompanying letter, was a voluntary proposition by Leiter, which he was under no obligation to make. It was not delivered to Cherry as a perfected lease, but as a proposition for his acceptance, if willing to agree to its terms. *Jordan* v. *Davis,* 108 Ill. 336; *Eliason* v. *Henshaw,* 4 Wheat. 228; 3 Washburn on Real Prop. (4th ed.) 292, 293.

Leiter's proposed renewal lease was not accepted by Cherry or Pike. *Brocket* v. *Barney,* 28 N. Y. 333; *Bronson* v. *Noyes,* 7 Wend. 191; *Berry* v. *Anderson,* 22 Ind. 39; *Rhodes* v. *School District,* 30 Me. 112; *Frazer* v. *Davie,* 11 S. C. 69; *Ford* v. *James,* 2 Abb. Dec. 159; *Fox* v. *Turner,* 1 Bradw. 150.

Messrs. GOUDY, GREEN & GOUDY, for the appellee Pike:

Pike, as assignee of the original lease, was entitled to an abatement of rent as to the west twenty-seven feet occupied for a street. As to the basis on which the abatement shall be made, see *Gillespie* v. *Thomas,* 15 Wend. 464; 3 Kent's Com. 469, 470; 10 Co. 128 a.

The tenant could file a bill to have the rent apportioned, or he could make an agreement with the landlord as to what the apportionment should be.

The payments of the rents, being under protest, were not voluntary. *Cazusvie* v. *Cutler*, 4 Metc. 246; *Morgan* v. *Palmer*, 9 E. C. L. 317; *Carew* v. *Rutherford*, 106 Mass. 1.

Skinner was appointed to appraise one hundred feet square, and the presumption is that he kept within the authority conferred upon him.

The renewal lease delivered by Leiter to Cherry was accepted, and became and is a valid and subsisting lease. Cherry had the right to accept the lease as part performance, and to hold Leiter, or any other person who was legally liable, for compensation for the balance. Story's Eq. Jur. sec. 779; 3 Parsons on Contracts, 382; *Hill* v. *Buckley*, 17 Ves. 394; *Jacobs* v. *Locke*, 2 Ired. Eq. 286.

Mr. H. F. VALLETTE, for the appellees Parmly and Sweet:

There was no such condemnation of the twenty-seven feet strip as entitled the city to the possession of it, or released the landlord from the covenant to renew the lease of it. *Parmelee* v. *Chicago*, 60 Ill. 267; *Railroad Co.* v. *Gates*, 120 id. 86; *Chicago* v. *Barbian*, 80 id. 487; *People* v. *McRoberts*, 62 id. 43.

Leiter having received the condemnation money for this strip, was equitably bound to allow to the tenant a rebate, proportioned to the value of the land taken, whether such taking was by condemnation or grant. Tuley's Laws and Ordinances of Chicago, 446, sec. 18; *Biggs* v. *Clapp*, 74 Ill. 335; *Burke* v. *Monroe County*, 77 id. 610; *Thompson* v. *Bulson*, 78 id. 287; *People* v. *Lœwenthal*, 93 id. 191; *Commissioners* v. *Commissioners*, 100 id. 631; *Reed* v. *Ward*, 22 Pa. 44; *Cole* v. *Patterson*, 25 Wend. 456; *Newell* v. *Wright*, 3 Mass. 138; *Russell* v. *Allen*, 2 Allen, 42; *Martin* v. *Martin*, 7 Md. 368; *Foot* v. *Cincinnati*, 11 Ohio, 408; *Cuthbert* v. *Kuhn*, 3 Whart. 000; *Chicago* v. *Barbian*, 80 Ill. 487; *Cook* v. *South Park Comrs.* 61 id. 115; *Brotherton* v. *Hott*, 2 Vern. 574; *Strong* v. *Shea*, 83 Ill. 575; *Swanzey* v. *Moore*, 22 id. 63; *Curtis* v.

*Sage,* 35 id. 39; *Tiernan* v. *Granger,* 65 id. 351; *Worden* v. *Sharp,* 56 id. 104.

When the landlord, by his wrongful acts, causes delay in the carrying out of the covenant which bound him to renew the lease, equity will not allow him to take a forfeiture of the leasehold rights for the delay thus caused. 2 Parsons on Contracts, 280; *Jones* v. *Gates,* 9 B. & C. 532; *Hein* v. *Hewitt,* 19 Me. 281; *Taylor* v. *Wilde,* 5 Mass. 116; *Chicago* v. *Barbian,* 80 Ill. 486; *Hoig* v. *Adrian College,* 83 id. 267; *Stone* v. *Duvall,* 77 id. 475.

The conduct of the tenants relied on as a forfeiture, was the simple assertion of a right to preserve their valuable legal rights. *Loach* v. *Farnum,* 90 Ill. 368; *Chapman* v. *McGrew,* 20 id. 101.

When leases contain valuable covenants for renewal, equity will not permit their forfeiture upon slight or technical grounds, nor hold them to have been waived by the tenant, unless that is the intent of the tenant, either expressed or fairly to be inferred from his language or conduct, or both, but will, if necessary, enforce their specific performance. The Leiter-Cherry and sub-leases are each valid as part performance, but the position and conduct of the superior and sub-tenants have been and are such, that if the renewal leases entered into, and even the award itself, could be held invalid, they would, in that event, be entitled to specific performance of the original covenants for renewal and the adjustment of their rebate rights. 2 Story's Eq. Jur. 1319, 1320; Daniell's Ch. 386, 387; *United States* v. *McRae,* L. R. 4 Eq. 327; *Life Ins. Co.* v. *Pierce,* 75 Ill. 426; *Morris* v. *Tillson,* 81 id. 607; *Palmer* v. *Ford,* 70 id. 369; 2 Kent's Com. 555; *Hathaway* v. *Power,* 6 Hill, 453; *Parkhurst* v. *Smith,* Wills Rys. 332; *Rawstone* v. *Bentley,* 4 Brown's Ch. 415; *Life Ins. Co.* v. *St. Charles,* 12 Abbott's Ch. (N. C.) 50; *Tscheider* v. *Biddel,* 4 Dil. 60; *Tobey* v. *County of Bristol,* 3 Story's C. C. 800; *Mitchell* v. *Harris,* 2 Ves. 129; *Scott* v. *Avery,* 5 H. of L. Cases, 811; *Biddell*

v̇. *Ramsey*, 52 Mo. 159; *Hopkins* v. *Gillman*, 22 Wis. 476; *McClure* v. *Otrich*, 118 Ill. 320; *Lawrence* v. *Beaubien*, 2 Bayley's S. and C. 623.

The Leiter-Cherry lease, and its counterpart, delivered to, received and held by Leiter, constitute a complete renewal obligation. Appellant is not only estopped by it, but its provisions are in his favor to the utmost he has ever contended for. *In traditionibus chartarum non quod dictum est, sed quod factum est inspicitur.* 9 Coke, 137; Leake's Digest Law of Contracts, 137; Sheppard's Touchstone, 58, 59; 2 Parsons on Contracts, 280; *Tunison* v. *Chamblin*, 88 Ill. 387; *McCann* v. *Atherton*, 106 id. 35; *Taylor* v. *Wilde*, 5 Mass. 116; *Hein* v. *Hewitt*, 19 Me. 281; *Lincoln* v. *Cook*, 2 Scam. 61; *Parkhurst* v. *Smith*, Wills Rys. 332; *Hathaway* v. *Power*, 6 Hill, 453; Hobart's Rep. 277; *Riall* v. *Rich*, 10 East, 47; *Higgins* v. *Halligan*, 46 Ill. 176; *Tracy* v. *Express Co.* 7 N. Y. 472; *Herrick* v. *Swartwout*, 72 Ill. 340; *Blackburn* v. *Bell*, 91 id. 434; *Lucas* v. *Beebe*, 88 id. 427; *Graves* v. *Colwell*, 90 id. 612; Chitty on Contracts, 5, 6, 7; *Parish* v. *Stone*, 14 Pick. 201; 1 Stephens' Com. 462; *Sutphen* v. *Cushman*, 35 Ill. 196; *Ruckman* v. *Alwood*, 71 id. 159; *Sharp* v. *Smitherman*, 85 id. 153; *Miller* v. *Holland*, 3 T. R. 590; *Crisman* v. *Matthews*, 1 Scam. 151; *Loach* v. *Farnum*, 90 Ill. 368; *Hume Bros.* v. *Taylor*, 63 Ill. 44; *Chapman* v. *McGrew*, 20 id. 101; *Barnet* v. *Barnes*, 73 id. 216; *Lindauer* v. *Cummings*, 57 id. 200; *Marks* v. *Pells*, 1 Johns. Ch. 594; *Kelly* v. *Bryan*, 6 Ired. Eq. 287; *Aborn* v. *Bennett*, 2 Blackf. 101; *Kelsey* v. *Snyder*, 118 Ill. 550; 2 Parsons ·on Contracts, 192; *Hough* v. *Life Ins. Co.* 57 Ill. 319; *Vroman* v. *Darrow*, 40 id. 173; *Weber* v. *Christen*, 121 id. 97; *People* v. *Bostwick*, 22 N. Y. 445; *Johnson* v. *Glover*, 121 Ill. 283.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The arguments on behalf of the several parties to this record have received such patient and careful consideration as we

are able to bestow, and our conclusion thereupon is, that the law is correctly applied to the facts of the case in the foregoing opinion of the Appellate Court, by Mr. Justice MORAN. We deem it necessary to add to what is therein said, only in answer to three objections urged against the views expressed, and that merely by way of amplification. In the order we shall pursue, the first and third of these objections are urged by counsel for appellees, and the second is urged by counsel for appellant.

*First*—The judgment of *condemnation* of the twenty-seven feet of the lots leased by Turnbull to the Bowens was not reversed by this court in *Parmelee et al.* v. *City of Chicago,* 60 Ill. 267. That was an appeal by certain parties from the judgments against their property on the delinquent *special assessment.* The ordinance under which this twenty-seven feet was taken and condemned was not held invalid, but the judgments for the particular delinquent special assessments were reversed solely because of the refusal of the court to receive evidence that the commissioners omitted to specially assess a street horse railway in common with other property specially benefited. On that reversal, it was therefore simply the duty of the commissioners to make a new assessment, correcting that error, leaving, meanwhile, the judgment for the value of the property taken, and for damages to property not taken, standing, so that whenever that judgment should be paid by the city, title would vest. And, manifestly, even if the judgment for damages was erroneous, the error might be waived by the owners. (*Baker* v. *Brannan,* 6 Hill, 47.) When Turnbull elected to sue, in the United States court, for the value of the property taken, and for damages, he waived all right to object to the taking and appropriation upon the payment of his judgment. He could not have both the property and its value. *Byars* v. *Spencer,* 101 Ill. 429 ; *Kellogg* v. *Turpie,* 93 id. 265 ; *Union Mutual Life Ins. Co.* v. *Slee,* 123 id. 57 ; *Clough* v. *London and Northwestern Railway Co.* L. R. 7 Exch. 34.

The deed of Turnbull placed in escrow, moreover, in terms, expressly waived and cured all objections that otherwise might have been urged by Turnbull as against the sufficiency of the judgment for condemnation. Although Turnbull had leased the property, he might sell and convey one part of his reversion to one person, and the remainder to another person. 3 Kent's Com. (8th ed.) p. 586, *469. The grantee of the reversion becomes liable on a covenant to renew the lease, because that covenant runs with the land. Taylor on Landlord and Tenant, (2d ed.) 332. Being a covenant running with the land, it is, necessarily, divisible. (Id. sec. 263.) And so, it must follow, that upon a conveyance of less than the whole of the reversion, the grantee can only be liable to renew the lease as to the part conveyed to him; and also, that when a person ceases to own a given part of the reversion, he must thereafter cease to be liable on the covenant to renew the lease.

A deed placed in escrow conveys nothing until the conditions are performed. "But," says Sheppard's Touchstone, (6th ed.) p. 57, *59, "when the conditions are performed and the deed is delivered over, then the deed shall take as much effect as if it were delivered immediately to the party to whom it is made, and no act of God or man can hinder or prevent this effect then." And it needs no authority to prove that that which the grantor himself can not do, in this respect, he can not empower his grantee to do, for his grantee can but occupy his position,—assuming, of course, that his grantee is chargeable with notice of the deed in escrow. Here, the deed of Turnbull to Leiter recites that it is "subject, however, to such rights as the said city of Chicago may have acquired to the west twenty-seven feet of said lots, * * * as a part of State street, by deed, condemnation proceedings, judgment or otherwise." And so Leiter, in legal presumption, knew of the existence and contents of the judgment and of the deed in escrow, and took subordinate thereto, and it is wholly immaterial what his knowledge, in fact, may have been.

After Turnbull had made the deed to the city, it is evident that all that he could convey to Leiter in respect to the west twenty-seven feet of the lots which he assumed to convey, was a mere contingent right to the reversion, to be terminated by the performance of the conditions of the escrow. It may be that if the lease had terminated before these conditions were performed, Leiter might have been required to renew the lease as to the twenty-seven feet; but we express no opinion upon that question, because it is not before us. But it is manifest, that since the duty of renewal is imposed upon the grantee of the reversion because of the ownership of the reversion,—or, in other words, because the covenant runs with the land,—the moment he ceases to be owner, when the reversion, and, with it, the covenant of renewal, has passed to another, his liability on the covenant of renewal must cease. The conditions of the escrow were performed, and the deed was delivered and placed upon record, before Pike acquired any interest in the lease, and long before the time required for the giving of notice of the election to have a renewal of the lease. It was therefore impossible that Leiter could have been bound by covenant of renewal of lease, as to this twenty-seven feet, to Pike.

*Second*—Authorities cited by counsel for appellant sustain the position that whether the transfer of a paper from one person to another is a delivery of that paper, is a question of intention, and that it is therefore competent to show that the transfer was *in trust* or upon condition, etc.; but that relates to the mere fact of the *delivery of the paper* itself, and has no reference to the *construction or the effect of the instrument* after delivery. The evidence, here, clearly shows that the paper containing the lease was sent by Leiter to Cherry, (that is, in legal effect, Pike,) with the intention that Cherry might accept it, and that this was done in discharge of Leiter's obligation, under the covenant, to renew the lease. There was no trust and no condition in regard to it. Cherry's acceptance bound Leiter to its performance, from the time of acceptance; and

so, also, the evidence is equally clear that Cherry sent the duplicate of the lease, which he had signed, to Leiter, as the evidence of his acceptance of the lease, and the completion of the evidence of the contract on his part, intending that it should at once be placed in Leiter's hands and under his absolute control, and immediately thereupon have all the effect that it ever could have. The evidence does show, however, that Cherry accompanied the delivery of the duplicate with a letter, in which he denied that the lease had the effect to obligate him to the payment of the rent therein provided to be paid by him; and we concede that if that letter had the effect to modify or change the terms of the lease, as executed by Leiter, the tender of Leiter was not accepted. But it is plain that it did not have that effect. The lease alone expresses the contract between the parties. Cherry's letter was not intended to be incorporated in the lease,—it was but his commentary upon the lease and upon questions that had been in contention between the parties before its execution. It gave Cherry no rights that he did not have before the letter was written, and that he could not as well have enforced if the letter had never been written. It is in nowise different from a verbal commentary of like purport accompanying the delivery, for the law gives no effect to a written commentary, in this respect, that it would not have given to it had it been verbal. The case, then, is precisely as if A, on executing and delivering his bond to B, whereby he obligates himself to pay B $1000 at a day named, were to say, "I shall not consider myself bound to pay you $1000." It is the doing of one thing, to which the law attaches a particular effect, and declaring that he intends directly the reverse, or something which is, in legal effect, materially different. That in such case the accompanying declaration is of no legal effect whatever, is well settled. The following may be added to the authorities cited on this point in the opinion of the Appellate Court: 2 Phillips on Evidence, (Hill, Cowen & Edwards'

notes,) p. 644, note 487; 1 Best on Evidence, (1st Am. ed. with Morgan's notes,) p. 424, sec. 226.

Undoubtedly, Leiter might have withdrawn his tender of a lease at any time before acceptance; but he ought not to have done so, because it was his duty, under the covenant to renew, to make the tender he did make, and Cherry was entitled to a reasonable time to get the opinion of counsel before acceptance, and Leiter did not, in fact, withdraw his tender. To have done so, he should have given notice to that effect, asking for a return of the paper. His act should have been unequivocal. He not only made no request that the lease be returned, but he did not reject and return, or offer to return, the duplicate signed by Cherry. The retention of that was a waiver of any right that he might have had before that time to withdraw the tender.

*Third*—The evidence fails to sustain the allegation of the bill that there was an agreement to make a rebate on the amount of rent after the taking of possession of the twenty-seven feet of the lots by the city. It shows that the subject was talked about by some of the parties in interest, at or about the time of such taking of possession by the city; but it fails to show any agreement in that respect, much less such an agreement as would bind Leiter. It is immaterial what claim Pike may or may not have against the city on account of its taking possession of the twenty-seven feet of the lots, and it is proper to keep in view that Leiter is responsible to Pike for no injury to his leasehold rights occasioned by the severance in the reversion effected by the respective conveyances thereof by Turnbull to the city and to Leiter. It is only pertinent to take into consideration that there was such severance, and that Leiter thereby became landlord as to the east seventy-three feet of the lots, and, as such, entitled to rent therefor, but only therefor, and that he has been paid rent by Pike for the entire lots.

Admitting, as contended by counsel for appellant, that the common law rule of abatement is applicable, namely, that the abatement shall be according to the value of the several parts of the land, (see 3 Kent's Com. 8th ed. 586, *467; Sedgwick on Measure of Damages, 2d ed. 194; Taylor on Landlord and Tenant, 2d ed. sec. 383,) it is evident that their further contention, that the amount of the abatement should be a sum equal to six per cent interest on the condemnation paid for the reversion in the twenty-seven feet taken, is inadmissible, because that is not according to the value of the several parts of the land; nor is it such an apportionment of the rent that, in the language of section 18, chapter 7, of the city charter, (under which were the condemnation proceedings) "the part thereof justly and equitably payable for such residue thereof, and no more, shall be paid or recoverable for the same." The condemnation money is not assessed upon the idea that the relation of the value of the leasehold and reversionary interests are to perpetually remain as fixed by the terms of the prior lease, but upon the·idea that the sum assessed is a fair and adequate compensation for the entire respective values of those interests at the date of the assessment. It is obvious that circumstances may have entirely changed their relative values since the execution of the prior lease. Where property is taken pursuant to a condemnation, the presumption is that each interest is fully compensated, according to the law, for the injury it sustains by reason of the taking, and in no view, where, as here, the property taken is leased, is the one interest to be burdened with making good the loss sustained by the other interest by reason of the taking; and so, whether the condemnation money, to the one or to the other, was more or less than it ought to have been, is an immaterial question in this connection.

Apportioning the rent by the common law rule, we are unable to say there is error in the amount of the abatement allowed by the decree. The evidence of the value of the several

parts was not as full and satisfactory as it might have been; still, on that evidence, we can not say the amount decreed to be abated was less than it should have been. Edmund A. Cummings testified, on cross-examination: "I should think the right of renewal, for twenty years, as to the east seventy-three feet alone, as of the value I have given, with an additional depth, which means an additional frontage on Madison street, means more than without that additional depth. I should think, from fifteen to twenty per cent more." And the witness, by his further answers, in effect, shows that this estimate is based on his estimate of the relative values of the parts. Albert I. Cole, on cross-examination, testified: "The right of renewal of a piece of land for the term of twenty years, from 1885, of a piece of ground one hundred feet deep on Madison street, by a hundred feet front on State street, is worth $20,-000. Taking off twenty-seven feet would impair it on the corner there fifteen per cent,—probably twenty."

No question was raised as to the admissibility of this evidence. There is evidence of a valuation of the seventy-three feet several years subsequent to the time of the taking of the twenty-seven feet; but there is no evidence of a valuation of the twenty-seven feet, other than the foregoing, at any time. The amount of abatement decreed by the court was twenty per cent upon the amount of rent paid by Pike to Leiter, and was certainly all that the evidence warranted. If the evidence does not sustain that abatement, inasmuch as it is clear it does not warrant a greater abatement, Pike is not injured by any error there may be in the decree in that respect.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. Justice Bailey, having heard this case in the Appellate Court, took no part in its decision here.